UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

Case No. 5:08-cv- 303-0L-10GKJ

REAL PROPERTY, INCLUDING
ANY BUILDINGS, APPURTENANCES,
AND IMPROVEMENTS THEREON,
LOCATED AT 1119 VISTA DEL MAR DRIVE
NORTH, DELRAY BEACH, FLORIDA,

CONTENTS OF SCOTTRADE INVESTMENT ACCOUNT
#62634848 IN THE NAME OF ONYX
HOLDINGS INC.,

CONTENTS OF BANK OF AMERICA ACCOUNT
#005481787549 IN THE NAME OF ONYX
HOLDINGS INC.,

CONTENTS OF BANK OF AMERICA ACCOUNT
#008983279882 IN THE NAME OF MAZEL
TUFF HOLDINGS LLC,

CONTENTS OF BANK OF AMERICA ACCOUNT
#898004313206 IN THE NAME OF MAZEL
TUFF HOLDINGS LLC,

CONTENTS OF FIRST REPUBLIC BANK ACCOUNT
#979-1000-2603 IN THE NAME OF MAZEL
TUFF TRUST #2 C/O ALAN LEDERFEIND,

CONTENTS OF FIRST REPUBLIC BANK ACCOUNT
#979-1000-2629 IN THE NAME OF MAZEL
TUFF TRUST #2 C/O ALAN LEDERFEIND,

CONTENTS OF WACHOVIA BANK ACCOUNT
#2000021391770 IN THE NAME OF D.P.
MINAHAN INC.,

CONTENTS OF WELLS FARGO BANK ACCOUNT
#3292102336 IN THE NAME OF WALL
STREET P.R. INC.,

CONTENTS OF BANK OF AMERICA ACCOUNT
#312719111 IN THE NAME OF CHARLES
E. BINGHAM,

CONTENTS OF BANK OF AMERICA ACCOUNT
#003738395055 IN THE NAME OF
MARTHA R. MCNEELY OR BONNIE
WHITE,

CONTENTS OF WELLS FARGO BANK ACCOUNT
#1914422793 IN THE NAME OF SNUGGLY
WUGGLY INC.,

BREITLING WRIST WATCH, SN 2538860,

JACOB & CO. WRIST WATCH, SN S3947,

18KT GOLD YACHT MASTER ROLEX WRIST
WATCH #750,

BREITLING WRIST WATCH, SN 2085412,

ONE LADY'S PLATINUM ORIGINAL "ROBERT
PELLICCIA" DESIGN SOLITAIRE ENGAGEMENT
RING FEATURING ONE ROUND BRILLIANT, FULL
CUT DIAMOND OF I COLOR, S12 CLARITY
WEIGHING 5.03 CARATS SET IN FOUR PRONG
FASHION,

2008 WHITE BENTLEY CONTINENTAL FLYING SPUR,
VIN #SCBBR93W58C052109,

2006 LAMBORGHINI GALLARDO
VIN #ZHWGU12T16LA02728,

$11,800 IN U.S. CURRENCY,

**Defendants.**

## VERIFIED COMPLAINT FOR FORFEITURE IN REM

The United States of America, by and through the undersigned Assistant United States Attorney, in a civil cause for forfeiture *in rem*, alleges upon information and belief, and in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure the following:

1.      This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

2.      This court has *in rem* jurisdiction over the defendant properties pursuant to:

        a.      28 U.S.C. § 1355(b)(1)(A), because pertinent acts of omissions giving rise to the forfeiture occurred in the Middle District of Florida; and

        b.      28 U.S.C. § 1355(b)(1)(B), because venue properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1395.

3.      Venue lies within the Middle District of Florida pursuant to 28 U.S.C. § 1395(a) because the instant civil action accrued in this judicial district.

4.      The Court's authority to order forfeiture of property for violations of 18 U.S.C. § 1343 and 15 U.S.C. § 78ff is found in 18 U.S.C. § 981(a)(1)(C).  Therefore, this civil action *in rem* is brought pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C), which provides for the forfeiture of any property, real or personal, which constitutes or is derived from proceeds from any offense constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offenses.  18 U.S.C.

§ 981(a)(1)(C).  A "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7),

includes offenses listed in 18 U.S.C. § 1961(1).  Specifically, 18 U.S.C. § 1961(1)

includes wire fraud and securities fraud offenses.  The investigation thus far has

revealed that the defendant properties were purchased with proceeds from wire and

securities fraud violations or are the proceeds of securities and wire fraud violations.

Therefore, the defendant properties are subject to forfeiture pursuant to 18 U.S.C. §

981(a)(1)(C).

     5.     This civil action *in rem* is also brought pursuant to 18 U.S.C. §

981(a)(1)(A), which provides for the forfeiture of any property, real or personal, involved

in violations of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957.  The funds used to purchase

the defendant properties are criminally derived funds that were moved thru several

bank and investments accounts (held by various corporations and entities) before being

used to purchase the defendant properties.  This was done in order to conceal or

disguise the illegal source of the funds used to purchase the defendant properties and

to disguise the true ownership of the defendant properties, in violation of 18 U.S.C. §

1956(a)(1)(B)(i).  Lastly, the transactions detailed in the attached affidavit were made in

violation of 18 U.S.C. § 1957(a) because the funds used to purchase the defendant

properties (excluding the Breitling Wrist Watch, SN 2085412) were derived from wire

fraud and securities fraud violations, were in excess of $10,000 and the defendant

properties' owners knew that the funds used to purchase the properties were criminally

derived.  As such, the defendant properties are subject to forfeiture pursuant to 18

U.S.C. § 981(a)(1)(A).

     6.     The defendant properties are more fully described as follows:

4

a.  Real property located at 1119 Vista Del Mar Drive North,
    Delray Beach, Florida, further described as Lot 4 and the
    East 32.5 feet of Lot 5, and the South 10 feet of
    abandoned Laing Street lying North of and adjacent to
    said lots, of DELRAY BEACH ESPLANDE, according to
    the Plat thereof, recorded in Plat Book 18, Page 39, of
    the Public Records of Palm Beach County, Florida, titled
    to Alan Lederfeind, as Trustee of The Mazel Tuff Trust
    #2.

b.  CONTENTS OF SCOTTRADE INVESTMENT ACCOUNT #62634848 IN
    THE NAME OF ONYX HOLDINGS INC.

c.  CONTENTS OF BANK OF AMERICA ACCOUNT #005481787549 IN
    THE NAME OF ONYX HOLDINGS INC.

d.  CONTENTS OF BANK OF AMERICA ACCOUNT #008983279882 IN
    THE NAME OF MAZEL TUFF HOLDINGS LLC

e.  CONTENTS OF BANK OF AMERICA ACCOUNT#898004313206 IN THE
    NAME OF MAZEL TUFF HOLDINGS LLC

f.  CONTENTS OF FIRST REPUBLIC BANK ACCOUNT #979-1000-2603
    IN THE NAME OF MAZEL TUFF TRUST #2 C/O ALAN LEDERFEIND

g.  CONTENTS OF FIRST REPUBLIC BANK ACCOUNT #979-1000-2629
    IN THE NAME OF MAZEL TUFF TRUST #2 C/O ALAN LEDERFEIND

h.  CONTENTS OF WACHOVIA BANK ACCOUNT #2000021391770 IN THE
    NAME OF D.P. MINAHAN INC.

i.  CONTENTS OF WELLS FARGO BANK ACCOUNT #3292102336 IN
    THE NAME OF WALL STREET P.R. INC.

j.  CONTENTS OF BANK OF AMERICA ACCOUNT #312719111 IN THE
    NAME OF CHARLES E. BINGHAM

k.  CONTENTS OF BANK OF AMERICA ACCOUNT #003738395055 IN
    THE NAME OF MARTHA R. MCNEELY OR BONNIE WHITE

l.  CONTENTS OF WELLS FARGO BANK ACCOUNT #1914422793 IN
    THE NAME OF SNUGGLY WUGGLY INC.

m.   BREITLING WRIST WATCH, SN 2538860

n.   JACOB & CO. WRIST WATCH, SN S3947

o.   18KT. GOLD YACHT MASTER ROLEX WRIST WATCH #750

p.   BREITLING WRIST WATCH, SN 2085412

q.   ONE LADY'S PLATINUM ORIGINAL "ROBERT PELLICCIA" DESIGN SOLITAIRE ENGAGEMENT RING FEATURING ONE ROUND BRILLIANT, FULL CUT DIAMOND OF I COLOR, S12 CLARITY WEIGHING 5.03 CARATS SET IN FOUR PRONG FASHION,

r.   2008 White Bentley Continental Flying Spur, VIN #SCBBR93W58C052109

s.   2006 Lamborghini Gallardo, VIN #ZHWGU12T16LA02728

t.   $11,800 in U.S. Currency

7.     The defendant properties are not within the jurisdiction of the Court. Even though the defendant properties are located outside the Middle District of Florida, the Middle District of Florida has jurisdiction over the forfeiture action, pursuant to 28 U.S.C. § 1355(b)(1)(A), because the acts giving rise to the forfeiture of the properties, namely the wire and securities fraud schemes, occurred there. As discussed in the attached affidavit, an inmate that was housed at FCC Coleman played an active role in orchestrating the securities fraud schemes, with co-conspirators, that subject the defendant properties to forfeiture. Additionally, one of the subjects utilized an investment account in the Middle District of Florida to hold the proceeds from one of the securities fraud schemes. That subject transferred the criminally derived funds out of such investment account, moved the funds through several other accounts he controlled and then used those funds to purchase some of the defendant property

6

subject to this action. Lastly, several of the investors in the stock schemes mentioned above are located in the Middle District of Florida. The United States does not request authority from the Court to seize the real property defendant at this time. The United States will, as provided by 18 U.S.C. § 985(b)(1) and (c)(1):

      a.    post notice of this action and a copy of the Complaint on the defendant real property;

      b.    serve notice of this action on the defendant real property owner(s), and any other person or entity who may claim an interest in the defendant, along with a copy of this Complaint;

      c.    file a lis pendens in county records of the defendant real property's status as a defendant in this *in rem* action.

8.     Specific details of the facts and circumstances supporting the forfeiture of the defendant properties are contained in the Affidavit of FBI Special Agent James Raby, which is attached hereto as Exhibit A and fully incorporated herein by reference.

9.     As required by Rule G(2)(f), the facts set forth in the attached affidavit support a reasonable belief that the government will be able to meet its burden of proof at trial. Specifically, for the reasons set forth in the attached affidavit, there is probable cause to believe that the defendant properties constitute or are derived from proceeds traceable to a violations of 18 U.S.C. § 1343, 15 U.S.C. § 78ff, and are involved in a transaction or attempted transaction in violations of 18 U.S.C. §§ 1956, 1957, and therefore, are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) and (a)(1)(A).

WHEREFORE, the United States respectfully requests that the process of forfeiture be issued against the defendant accounts, jewelry, vehicles, and currency; that due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed, that the court decree the condemnation and forfeiture

of the properties to the United States for disposition according to law, and that the

United States be granted such other relief as the court deems just and proper.

Respectfully submitted,

ROBERT E. O'NEILL
United States Attorney

By:

**Nicole M. Andrejko**
Assistant United States Attorney
Florida Bar No. 0820601
501 West Church St., Suite 300
Orlando, FL 32805
Telephone: (407) 648-7500
Facsimile: (407) 648-7643
E-mail: Nicole.Andrejko@usdoj.gov

8

## VERIFICATION

I, James Raby, hereby verify and declare under penalty of perjury as provided by

28 U.S.C. § 1746 that I am a Special Agent with the Federal Bureau of Investigation,

that I have read the foregoing Verified Complaint *in rem* and know the contents thereof,

and that the matters contained in the Verified Complaint are true and correct to my own

knowledge, except those matters herein stated to be alleged on information and belief

and, as to those matters, I believe them to be true and correct.

The sources of my knowledge and information, and the grounds of my belief are

the official files and records of the United States, information supplied to me by other

law enforcement officers, as well as my investigation of this case and other cases.


Executed this 25th day of July, 2008.

James Raby, Special Agent
Federal Bureau of Investigation

STATE OF FLORIDA

COUNTY OF ORANGE

## AFFIDAVIT

I, James Raby, being duly sworn, depose and state following:

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have worked in this capacity since November 1996. I am currently assigned to the FBI Jacksonville Division, Coleman Offsite Office, Coleman, Sumter County, Florida.

2.      During my employment as a Special Agent, I have initiated and participated in numerous investigations resulting in the arrest and conviction of drug and money laundering suspects and the seizure of large amounts of illegal proceeds. In addition, I have also received extensive training in financial and money laundering investigations.

3.      As a result of my experience and training, I have become intimately familiar with the manner in which criminals communicate by telephone, including coded language used in attempts to disguise the true meaning of their conversations. Additionally, I have extensive experience in investigating individuals who attempt to conceal proceeds of illegal acts, including the use of trusts and corporations to disguise the true owner of illicit funds they control through these entities. I have also become knowledgeable about the methods and means by which money is laundered and the efforts of persons involved in such activities to avoid detection by law enforcement. As an FBI Special Agent, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance, undercover law enforcement personnel, and cooperating sources of information, including cooperating defendants.

## INTRODUCTION

4.     The FBI and Office of the Inspector General have joint jurisdiction to investigate allegations of criminal misconduct involving Department of Justice employees as well as criminal activities that impact on Department of Justice programs, to include conduct involving employees and programs within the Federal Bureau of Prisons ("BOP"). In particular, many of these investigations involve inmates in the custody of the BOP, using BOP programs to facilitate criminal activity, including the use of inmate telephones, visitation, trust funds, and e-mail systems which were established to ensure the order, discipline, or security of the prison system. As part of my duties, I have conducted investigations relating to criminal activity by BOP personnel and inmates involving violations of 18 U.S.C. §§ 1956 and 1957, Laundering of Monetary Instruments.

5.     This investigation is being conducted by the FBI and the Investigations Division of the Office of Inspector General, Department of Justice. This investigation has included physical surveillance, interviews, reviews of public, corporate, and court records, and the analysis of bank and other financial institution records. Any facts or circumstances which are mentioned in this affidavit are familiar to me, either through my direct participation in this investigation or from my discussions with witnesses and other Special Agents. I have familiarized myself with all of the documents and records obtained, or witnesses interviewed, either directly from my participation or from conversations with agents participating in this investigation. This affidavit is being submitted for the limited purpose of supporting the civil forfeiture complaint against:

2

(A)     The contents of the following accounts:

(1)     Contents of Scottrade Investment Account # 62634848, in the name of Onyx Holdings Inc ("Onyx Scottrade Acct.");

(2)     Contents of Bank of America Bank Account # 005481787549, in the name of Onyx Holdings Inc ("Onyx Bank Acct.");

(3)     Contents of Bank of America Bank Account # 008983279882, in the name of Mazel Tuff Holdings LLC ("Mazel Tuff Bank Acct. #1");

(4)     Contents of Bank of America Bank Account # 898004313206, in the name of Mazel Tuff LLC ("Mazel Tuff Bank Acct. #2");

(5)     Contents of First Republic Bank Account # 979 1000 2603 the name of Mazel Tuff Trust #2 C/O Alan Lederfeind ("Poyner's Trust Acct. #1");

(6)     Contents of First Republic Bank Account # 979 1000 2629, in the name of Mazel Tuff Trust #2 C/O Alan Lederfeind ("Poyner's Trust Acct. #2");

(7)     Contents of Wachovia Bank Account # 2000021391770, in the name of D.P. Minahan Inc ("D.P. Minahan Bank Acct.");

(8)     Contents of Wells Fargo Bank Account # 3292102336, in the name of Wall Street P.R. Inc ("Wall Street Bank Acct.");

(9)     Contents of Bank of America Account # 312719111, in the name of Charles E. Bingham ("Charles Bingham Bank Acct.");

(10)    Contents of Bank of America Account # 003738395055, in the name of Martha R McNeely or Bonnie White ("McNeely Bank Acct."); and

(11)    Contents of Wells Fargo Bank Account # 1914422793, in the name of Snuggly Wuggly Inc. ("Snuggly Wuggly Bank Acct.").

(B)     The following real property:

(1)     1119 Vista Del Mar Drive North, Delray Beach, Florida, ("Vista Del Mar property").

(C)     The following vehicles:

(1)     2006 LAMBORGHINI GALLARDO, VIN #ZHWGU12T16LA02728 ("2006 Lamborghini"); and

3

    (2)    2008 WHITE BENTLEY CONTINENTAL FLYING SPUR, VIN #SCBBR93W58C052109 ("2008 Bentley").

(D)    The following jewelry:

    (1)    BREITLING WRIST WATCH, SN 2538860 ("Breitling watch #1");

    (2)    JACOB & CO. WRIST WATCH, SN S3947 ("Jacob & Co. watch");

    (3)    18KT GOLD YACHT MASTER ROLEX WRIST WATCH #750 ("Rolex");

    (4)    BREITLING WRIST WATCH, SN 2085412 (Breitling watch #2; and

    (5)    ONE LADY'S PLATINUM ORIGINAL "ROBERT PELLICCIA" DESIGN SOLITAIRE ENGAGEMENT RING FEATURING ONE ROUND BRILLIANT, FULL CUT DIAMOND OF I COLOR, S12 CLARITY WEIGHING 5.03 CARATS SET IN FOUR PRONG FASHION ("diamond ring").

(E)    $11,800 in U.S. Currency

## BACKGROUND

    6.    Cort POYNER, Daniel MINAHAN, Charles BINGHAM, Salvatore PUCCIO, Roman SOTO, and Martha MCNEELY, the relevant individuals and their corporations identified in this affidavit, participated in a complex scheme to commit fraud through false representations, by means of wire fraud and securities fraud against the owners of small companies and the investing public who purchased shares of stock in the public companies under the their control. The relevant individuals formed companies, established bank accounts, trading accounts, and hired nominees, lawyers, and accountants, to further their criminal conduct. They offered financial support, marketing services, and business consulting services to the owners of small companies seeking capital to expand their companies. They would promise funding sufficient to meet the needs of the owners seeking to expand their small companies in exchange for

4

agreements that would enrich themselves through the sale of publicly traded stock. In each instance, the relevant individuals would fund and oversee the establishment of these public companies, control information delivered to the investment public, and fraudulently obtain control over stock in these companies. As part of the scheme, they would use investor relation campaigns to distribute information boasting unrealistic claims about the growth of the companies, seeking to drive up the price of the publicly traded shares. In furtherance of the scheme, the relevant individuals would hire technicians to establish computer servers that would send millions of unsolicited e-mails, touting the stocks under their control, as well as distribute unsolicited stock newsletters, touting the same stocks to thousands of facsimile machines. Finally, the relevant individuals would sell their unrestricted shares to the public, realizing millions in profits from the sale of their stock. After realizing huge profits from the sale of their stock, the relevant individuals would withdraw their offer of funding, or in some cases, end their funding commitments. Ultimately, their fraudulent conduct resulted in the collapse of the stock price or the failure of the companies altogether.

7.      Specifically, the relevant individuals established The Silverman and Minahan Group, LLC, Onyx Holdings, Inc., Mazel Tuff LLC, Mazel Tuff Holdings LLC, Mazel Tuff Trust #2, D.P. Minahan, Inc., and the Silverman and Minahan Beverage Company LLC, Wallstreet P.R., Inc., Snuggly Wuggly, Inc., Stock Communications, Inc., and other corporations not specifically mentioned in this affidavit specifically to promote their fraudulent schemes. Through these companies, they established investment accounts and bank accounts to receive, sell, and invest the proceeds of stocks gained through their fraudulent schemes and to further promote their illegal

5

conduct by concealing and disguising the owner and source of the funds held in these accounts. The relevant individuals then transferred portions of their illicit proceeds from their corporate bank accounts to their individual accounts for their personal use and to further conceal and disguise the owner and source of these funds. The relevant individuals conducted fraudulent schemes as described above by gaining control and selling stock in Edgetech International, Inc. ("Edgetech") and Renegade Energy Corporation ("Renegade Energy"). For the purposes of this affidavit, I will detail and trace proceeds from the fraudulent schemes involving Edgetech and Renegade Energy, even though there is probable cause to believe that stock of other corporations, under the control of the relevant individuals, was sold and the proceeds commingled with the proceeds traced in this affidavit. The corporations formed by the relevant individuals and used to establish investment and bank accounts were used to gain, sell, and transfer proceeds from all or part of frauds involving the companies mentioned above. For example, witnesses in this affidavit and others not specifically mentioned herein, identified schemes involving Simply Fit Holdings, Inc., New York Regional Railroad, Continan Communications Inc., Texxon, Inc., Mobile Ready Communications, Reality Racing Inc., Neah Power Systems, Black Gold Gas and Oil Inc., Total Luxury Entertainment Inc., UDS Group, Adrenaline National Entertainment, Michelex Inc., OneLink Corporation, Industrial Biotechnology and Produce Safety and Security International, stock of which was controlled and sold by one or more of the relevant individuals. Based upon witness interviews and the review of documents relating to these corporations and entities, there is no evidence of legitimate funds being used to

6

purchase the assets described in this affidavit or the contents of the accounts described in this affidavit.

## DEFINITIONS

8.     The Pink Sheets LLC ("Pink Sheets"), is a centralized, electronic quotation service that collects and publishes quotes for stocks of publicly traded companies.  In order to have their stocks traded on the Pink Sheets, companies are required to file disclosure documents, which are available to the investing public through the Pink Sheets website.

9.     Restricted Stock, is stock that can not be legally sold under federal securities laws until it is registered or met an exemption from registration.  Restricted stock is normally marked with a restricted legend by the company's transfer agent, which assists in issuing and canceling stock certificates and in recording changes of ownership.

10.    "Freely Tradable" or Unrestricted Stock, is stock that is issued without a restrictive legend, which can be sold to the investing public.  Before removing a restrictive legend, a transfer agent typically requires an opinion letter from an attorney stating that the stock complied with an exemption from the registration requirements.

## RELEVANT INDIVIDUALS

11.    Salvatore PUCCIO ("PUCCIO") is an admitted member of the Bonanno Crime Family and is currently incarcerated for his role in a securities fraud and money laundering conspiracy dating back to 1999, in which he ran, managed, or controlled several brokerage houses in South Florida.  On May 20, 2005, PUCCIO was arrested

7

on arson, securities fraud, and money laundering charges based upon an indictment in the Southern District of Florida, Ft. Lauderdale Division. PUCCIO pled guilty to these charges and was sentenced to prison on July 10, 2006. He reported to the FCC to begin his sentence on August 25, 2006. PUCCIO's conduct involved the selling of unregistered securities, using deceptive sales practices, not disclosing profits made during sales of stock as required by the SEC, receiving as much as a 66 percent commission from the sale of the stock, and returning 20 to 30 percent to brokers selling the stock, without disclosing the commissions to clients of his companies. This conduct was the basis of the securities fraud and money laundering counts in his conviction. In addition to his sentence of 96 months in prison, PUCCIO was ordered to pay more than $1.6 million in restitution to his victims. PUCCIO is currently in the custody of the Federal Bureau of Prisons.

12.     Cort POYNER ("POYNER") is a business partner of PUCCIO, living at 1119 Vista Del Mar Drive North, Delray Beach, Florida. POYNER is active in consulting and providing financing for small businesses seeking investment capital for growth. POYNER specializes in "reverse mergers," described as merging previously held public companies, no longer active, and merging these "shell" companies with privately held companies seeking investment capital. POYNER controls singularly, or in partnership with Daniel MINAHAN, The Silverman and Minahan Group, LLC; Onyx Holdings, Inc., Mazel Tuff, LLC; Mazel Tuff Holdings, LLC; and the Silverman and Minahan Beverage Company, LLC, which are all Florida based corporations or corporations authorized to conduct business in Florida. Additionally, POYNER controls Mazel Tuff Trust #2, a New York based trust. These businesses are all associated with the fraudulent schemes

8

described in this affidavit.  On April 3, 2008, a jury found POYNER guilty of a series of

securities related violations in an action bought against him by the SEC based upon his

conduct with the Children Internet Fund from 2002 until 2005.  Specifically, POYNER

was found guilty of fraud, engaging in the sale of unregistered securities, and acting as

an unregistered securities broker.  From November 11, 2004, until December 22, 2004,

some of POYNER'S telephone communications with PUCCIO were intercepted by the

Broward County Sheriff's Office, Organized Crime Unit, during a court authorized wire

intercept investigation of PUCCIO.  Fourteen conversations between POYNER and

PUCCIO were listed pertinent as they related to an ongoing securities fraud scheme

involving POYNER and PUCCIO.  PUCCIO's guilty plea to securities fraud violations

included the conduct captured during wire intercepts between PUCCIO and POYNER.

There is probable cause to believe that all of POYNER'S income earned from

September 16, 2002 until the date of this affidavit is directly related to his fraudulent

activities.

      13.    Daniel MINAHAN ("Minahan") is a business partner of POYNER and

PUCCIO.  MINAHAN is active in consulting and providing financing for small

businesses seeking investment capital for growth.  MINAHAN is often introduced by

POYNER as the active partner in their business, who oversees operations due to health

issues that require POYNER to undergo kidney dialysis. MINAHAN controls singularly,

or in partnership with POYNER, The Silverman and Minahan Group, LLC, D.P.

Minahan, Inc., and the Silverman and Minahan Beverage Company, LLC.  Based upon

a review of MINAHAN'S bank account, MINAHAN appeared to receive income from

Mainline Mortgage from March 2004 until November 26, 2006, with one additional

payment from Mainline Mortgage of $7,890 on January 25, 2007. As such, there is probable cause to believe that all of MINAHAN'S income earned from January 26, 2007 until the date of this affidavit is directly related to his fraudulent activities

14.    Roman SOTO ("SOTO") is the brother in law of Salvatore PUCCIO, and the brother of PUCCIO's wife, Priscilla Puccio. SOTO singularly controls The Mendocino Group, Inc., a Florida based corporation. There is probable cause to believe that all of MINAHAN'S income earned from January 26, 2007 until the date of this affidavit is directly related to his fraudulent activities.

15.    Martha MCNEELY, also known as Marcie MCNEELY ("MCNEELY"), is the girlfriend of POYNER. MCNEELY acts as a nominee for POYNER by forming corporations used to receive stock intended to be manipulated by POYNER and also acts as a nominee on bank accounts controlled by POYNER.

16.    Charles E. BINGHAM ("BINGHAM") is a business partner of POYNER. BINGHAM is the owner of Wall Street P.R., Inc. and controls Stock Communication Group, Inc., Texas based corporations. On May 14, 2002, Bingham received a citation from the Federal Communications Commission for sending unsolicited advertisements to telephone facsimile machines and for failing to clearly mark the identification of the business and telephone sending the facsimile transmissions. There is probable cause to believe that all of BINGHAM'S income earned from December 3, 2004 until the date of this affidavit is directly related to his fraudulent activities.

17.    Tolan Furusho ("Furusho") is an attorney with offices in Bellevue, Washington. Furusho acted as an attorney for an owner of a privately held company, contracted by POYNER, to bring his company public under the name of Edgetech

10

International.  Additionally, on May 9, 2006, Furusho provided POYNER with an opinion letter to convert restricted stock to free trading stock as part of the fraud involving Edgetech International discussed later in this affidavit.  On November 28, 2007, Furusho pled guilty to an information alleging that Furusho provided fraudulent opinion letters to stock transfer agents causing restricted stock to become free trading stock. Specifically, Furusho was alleged to have signed an opinion letter on May 9, 2006, drafted by a co conspirator, and sent it to America Asia Energy's Corporation's ("America Asia") transfer agent, causing the fraudulent removal of restrictive legends and converting the restricted stock into free trading stock.

18.    Beverly Clayton ("Clayton"), also known as Beverly Claydon, and Beverly Kammerling, is a business associate of Tolan Furusho, living in Bellevue Washington. Clayton was hired by POYNER to represent the interests of the owner of a privately held company, later merged into a public shell and called Renegade Energy Corporation ("Renegade Energy").  On December 4, 2007, Clayton was indicted by a Grand Jury in the Western District of Washington, Seattle Division, for conspiracy to commit securities fraud and mail fraud.  The indictment alleged that Clayton conspired with others to obtain publicly traded companies, conceal her own involvement and the involvement of other co-conspirators in those companies, and to facilitate the issuance of restricted and freely tradable stock to other conspirators.  Clayton, who was the subject of a 1997 civil enforcement action by the SEC resulting in a $1,479,086.51 monetary judgment against her, was alleged to have used Corporate Northwest Services, a company controlled by Clayton, but owned by her mother Joyce Claydon, to conceal her interest in America Asia.  Clayton and her co conspirators were alleged to

11

have participated in a scheme to profit from the control and manipulation of freely

tradable America Asia stock by causing the dissemination of misleading press releases

to raise the value of the stock they controlled and sold. This case is pending trial.

## RELEVANT ENTITIES

19.     In relation to Cort POYNER, I reviewed records from the Florida Division

of Corporations for "Onyx Holdings Incorporated," "Mazel Tuff Holdings LLC," "Mazel

Tuff LLC," and "The Silverman and Minahan Group LLC."

20.     I found Onyx Holdings was formed on April 19, 2002, and administratively

dissolved for not filing an annual report on September 14, 2007, listing the president,

secretary, director, and sole officer as Cort POYNER. The principal address was listed

as 975 Banyon Drive, Delray Beach, Florida, 33483.

21.     I found the Silverman and Minahan Group LLC, formed on August 9,

2005, and administratively dissolved for not filing an annual report on September 14,

2007, listing its principal address as 975 Banyon Drive, Delray Beach, Florida, 33483.

Cort POYNER and Daniel MINAHAN were both listed as managing members and both

listed their address as 920 NE 16 Terrace Unit 2N, Ft. Lauderdale, Florida, 33304.

22.     I found Mazel Tuff Holdings, LLC was formed on July 14, 2006, and

administratively dissolved for not filing an annual report on September 14, 2007, listing

the manager as Cort POYNER C/O Kain and Valinsky PA, Ft. Lauderdale, Florida.

Kain and Valinsky PA of 750 SE 3rd Ave, Suite 100, Ft. Lauderdale, Florida, 33316,

was also listed as the registering agent and principal address for the business.

23.     I found Mazel Tuff, LLC was established on March 18, 2007, as a foreign

limited liability company operating in Florida. The company is still active and lists

12

POYNER as the manager and the principal address as C/O Robinson Brog/ATN: Mitchell Greene, 1345 6th Ave., 31st Floor, New York, NY, 10105.

24.     I found that Wall St. P.R., Inc. was established on May 28, 2002, as a corporation operating in Texas. The company lists BINGHAM as the registered agent and the principal address of 2425 West Loop STE 200, Houston, TX, 77027.

25.     I found that D. P. Minahan, Inc. was established on February 10, 2004, as a corporation operating out of Florida. The company is still active and lists MINAHAN as the President and the principal address as 920 NE 16th TER, 2N, Ft. Lauderdale, FL, 33304.

26.     Special Agent Jeff Brunner found that Snuggly Wuggly, Inc. was established on December 5, 2005, as a corporation doing business out of Texas. The company is no longer active. Shannon Clegg was listed as the registered agent, with the principal address as 1814 Keatly Dr, Houston, TX, 77077-5124.

## CONNECTION TO FCC COLEMAN

27.     In November 2007, SA Raby and Special Agent Jeffrey Brunner, DOJ, OIG ("SA Brunner") interviewed inmate Christopher Mylett ("Mylett") who was incarcerated with PUCCIO at the Low Security Facility in the Federal Correctional Complex located in Coleman, Florida (Low), from October 2006 until January 2007. During that time, Mylett observed PUCCIO discuss details about three publicly traded companies with inmates and staff members, touting the companies as successful, claiming ownership in the stocks, and suggesting that other people invest in the stocks to gain quick profits. Mylett knew Bureau of Prison ("BOP") staff members invested in some of the stocks and believed they made money in the investments. Your affiant

13

later identified two of the stocks mentioned above to be Renegade Energy and Edgetech International. Additionally, Mylett identified one of the stocks to be Renegade Energy and admitted that he and other inmates invested in the stock on PUCCIO'S recommendation and lost money in the stock. Additionally, I found three BOP staff members who invested in Edgetech and Renegade Energy stock.

28.     The BOP provides limited e-mail access to inmates housed at the Low. In conjunction with this access, the BOP monitors e-mail communication between inmates and other individuals, as authorized by BOP policy and procedures. I reviewed BOP e-mail records, covering a period between November 2006 to January 2007, concerning e-mail communication between PUCCIO; his attorney, Thomas Sclafani; his brother in law, SOTO; his wife, Priscilla Puccio; and his brother, Joey Puccio, which were recorded and maintained by the BOP. I found e-mails sent and received by PUCCIO concerning Edgetech stock and attempts to contact POYNER and MINAHAN regarding same. These e-mails were sent while PUCCIO was in the Middle District of Florida and during the same time that the Edgetech and Renegade Energy schemes were being orchestrated.

29.     On July 22, 2008, search warrants were executed on POYNER, MINAHAN, SOTO and BINGHAM'S residences as a result of their involvement with the activities described in this affidavit. POYNER'S residence is the real property named as a defendant herein and the 2008 Bentley was seized during the execution of the search warrant at his residence. Additionally, the search of MINAHAN's residence led to the seizure of the $11,800 in U.S. Currency and four watches found at his residence. Documentation was located in MINAHAN's home which as provided probable cause to

14

seize the 2006 Lamborgini and diamond ring.   Moreover, seizure warrants were

executed on the eleven financial accounts named as defendants in this civil forfeiture

complaint after this Court found that there was probable cause to believe that the

accounts were involved in money laundering offenses and contained proceeds

traceable to wire and securities fraud violations.

## I.  EDGETECH FRAUD

30.    On April 10, 2008. SA Brunner interview Lev Parnas, the owner of

Edgetech International.  Parnas was seeking an investment of $5 million to help

develop a hand held device capable of accessing the internet at increased speeds over

portable devices, called the Pocket Surfer.  In late 2004 to early 2005, Parnas was

introduced to POYNER by his own attorney, Jay Valinsky ("Valinsky"), of the law firm

Kain and Valinsky, PA.  POYNER was introduced as the previous owner of a brokerage

firm who now concentrated on helping companies with financing and business

management.  After several discussions, POYNER agreed to provide financing for the

development of the Pocket Surfer and obtain a corporate shell that could be used to

form a company with publicly traded stock. During their discussions, POYNER

introduced Parnas to MINAHAN as one of business partners. POYNER also introduced

Parnas to investors, Steve Sowieja and Carl Feldman.  POYNER and his associates

appeared to be excited about the Pocket Surfer and they eventually agreed upon a

compensation package for the investors.  POYNER'S compensation package included

control of ten percent of the new company shares as compensation for POYNER

locating a publicly traded shell company and a stock purchase agreement for

discounted stock in exchange for POYNER providing the financing package of $3 to $5

15

million, the capital necessary to develop the Pocket Surfer.

31.     POYNER and Valinsky reviewed several corporate shells, seeking a shell suitable for the needs of Parnas and his company.  They decided to use Dairene International because the shell was held by a small group of investors that included POYNER and his investor associates.  The small number of stockholders, all of whom agreed to hold their stock because of the potential growth of the company, was desirable to Parnas to avoid the uncontrolled selling of shares by numerous stock holders seeking quick profits.  Parnas agreed to a stock swap of his company for the shares of the shell company, eventually renaming the company Edgetech International. In exchange for the shell, POYNER and his investors received 10 percent of the shares of the new company.  While stating he signed a document concerning who controlled the free trading shares prior to the public trading of the company, Parnas did not take notice of the ownership group until approximately 3 months after the company went public.  Approximately 5.3 million shares were divided among POYNER and his associates in the following manner:

| | |
|---|---|
| Silverman and Minahan Group Inc. (POYNER and MINAHAN) | 2,650,000 |
| The Mendocino Group Inc. (SOTO) | 1,250,000 |
| Kain and Valinsky PA | 375,000 |
| Cort POYNER | 292,000 |
| Kenneth Dunn PA | 250,000 |
| Steve Sowieja | 200,000 |
| Carl Feldman | 150,000 |
| Tournament Capital Inc | 125,000 |

32.    Parnas said he was upset to learn that Valinsky received 375,000 shares of unrestricted stock. It was Parnas's view that Valinsky was compensated for his work by receiving 1.11 million shares of restricted stock as well as a revenue agreement giving him one percent of certain subscription revenues for each Pocket Surfer device. Parnas questioned Valinsky about the shares and Valinsky said he received the shares from the investors as a finder's fee.

33.    Parnas was later approached by Valinsky and POYNER, who persuaded him to conduct a 2 for 1 stock split (the creation of additional shares that provides the holder of any shares with one additional share of stock for each share they hold), doubling the amount of shares held by the company and POYNER's investment group. Additionally, Valinsky suggested they change transfer agents to a company in Colorado called National Stock Transfer. Parnas did not recall the reason used by Valinsky and POYNER for requesting the stock split or the change of transfer agents; however, as president and majority stockholder, he approved the issuance of the new shares and change of transfer agents, relying on the guidance of POYNER and Valinsky. Parnas knew that the shares they were receiving would not be restricted due to an opinion letter provided by attorney Furusho, representing Dairene International, which removed the restriction legend on the stock shares. Parnas said he was not concerned about POYNER's control over the unrestricted shares of the stock because POYNER and his investors told him they would not sell their shares once they received them, but would hold them to take advantage of the increase in the value of his company once the Pocket Surfer was developed and sold. POYNER did say he and his investors would sell limited shares of their stock as necessary to promote an orderly market for the

17

trading of the shares. Parnas said he never sold any stock in his possession.

34.     On or about April 2006, Parnas said POYNER was late in providing funds to Parnas under their financing agreement, causing Parnas to come close to default on his contractual obligations with a company developing the Pocket Surfer. POYNER called Parnas and told him to meet a person at a bank who would provide him with a check for $150,000. Parnas met a person he later learned was PUCCIO. PUCCIO provided Parnas with a cashier's check for $150,000 remitted by a company called "The Whit Group." Parnas deposited the funds and was later contacted by attorney James Sallah, who determined the check came from PUCCIO and that PUCCIO was indicted for securities fraud. Parnas said he questioned POYNER about the investment. POYNER assured Parnas the money was owed to him by PUCCIO and was a simple transfer of debt. He assured Parnas neither PUCCIO, nor anyone associated with PUCCIO, had an investment interest in his company. Based upon that assertion, POYNER provided a letter by PUCCIO transferring the interest in the $150,000 payment from The Whit Group to Onyx Holdings, Inc (a company controlled by Poyner). Parnas said he was never told the Mendocino Group (controlled by SOTO, the brother in law of PUCCIO) controlled the second largest percentage of the unrestricted shares of his company.

35.     Parnas remembered that his stock began public trading in spring 2006. He noticed the stock was trading in unusually high volume with a dramatic price increase from the initial offering of $1.08 per share. At one point, the share price rose to $5, drawing scrutiny from the SEC, also called the Financial Industry Regulatory Authority ("FINRA"). Shortly after trading of the stock began, his attorney was

18

contacted by FINRA.  FINRA provided his attorney with a copy of an unsolicited press release issued by UrgentStockAlert.com, dated June 15, 2006, making spectacular market, revenue, and stock price predictions about Edgetech International.  Parnas subsequently issued a press release notifying the investment public that unauthorized press releases were being issued.  Parnas was unable to determine who caused the issuance of the press release and who was selling their unrestricted shares.  Parnas ultimately ended his financing agreement with POYNER when he realized that POYNER would no longer provide financing or act in the best interest of his company. In June 12, 2008, shares of Edgetech International closed at 0.07 per share.  Parnas believed POYNER'S conduct, while enriching POYNER, MINAHAN, and SOTO and other investors, negatively impacted his ability to raise future capital to run his company.

36.     I reviewed relevant corporate records of Edgetech International and observed that Furusho provided the opinion letter on May 9, 2006 resulting in the conversion of 5,292,000 restricted shares of stock in Edgetech International into unrestricted shares that POYNER, MINAHAN, SOTO, and his investors sold for huge profits, well exceeding their investment in the company.  I believe that the opinion letter was fraudulent in nature based upon the indictment of Furusho for similar conduct.

37.     Based upon my investigation, there is probable cause to believe that POYNER, MINAHAN, and his investors mislead Parnas into believing they were interested in a long term investment in Edgetech.  POYNER mislead Parnas about PUCCIO'S investment and control of shares in Edgetech, and provided financing solely for the purpose of gaining control of unrestricted stock.  There is also probable cause to

19

believe POYNER and BINGHAM caused the rise of Edgetech stock through fraudulent and unauthorized press releases issued by UrgentStockAlert.com (a common scheme used by Bingham) and POYNER, MINAHAN, SOTO, PUCCIO and BINGHAM illegally profited from the sale of stock, while using the companies, investment accounts, and bank accounts under their control to promote their illegal activities.

## A.   TRACING OF EDGETECH PROCEEDS

### 1.   Onyx Scottrade Account

38.    Your affiant reviewed records from Scottrade Account # 62634848, in the name of Onyx Holdings, Inc. ("Onyx Scottrade Acct."), held by Cort POYNER.  The Onyx Scottrade account was opened on September 7, 2006, by POYNER in Boca Raton, Florida.  POYNER holds signature authority on the account.  On or about September 13, 2006, the account, which held no shares of stocks other than Edgetech stock, received from a clearing house, 956,632 shares of Edgetech unrestricted stock issued to POYNER as a result of the criminal fraud described above.  From September 18, 2006 until October 26, 2006, this account generated more than $509,955.87 from the sale of 361,394 shares of stock in this account.  However, Scottrade refused to sell any of POYNER'S other securities due to an ongoing SEC suit against POYNER for his role in the Children's Internet Fund.  As such, on December 7, 2006, POYNER transferred the remaining shares of Edgetech stock to a Park Financial Account he controlled.  As of March 31, 2008, the balance of this account was $22,620.58.  No other money was deposited into this account and the account held only the proceeds from the sale of Edgetech stock.

20

39.    The funds contained within the Onyx Scottrade Acct. are proceeds from the securities fraud scheme and wire fraud violations; thus, are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C).

## 2. Onyx Bank Account

40.    I reviewed bank records from Bank of America Account # 005481787549, opened on May 2, 2002 in Boca Raton, Florida, in the name of Onyx Holdings, Inc. ("Onyx Bank Acct."), with the company address of 1768 Bay Drive, Pompano, Beach, Florida, 33062. The sole signature authority on the account was Cort POYNER, listed as president of the company. On May 13, 2003, Martha "Marcie" MCNEELY was added as an additional person with signature authority on the account.

41.    Your affiant also reviewed records from Park Financial Brokerage Account # 65110736 ("Park Financial Acct."), in the name of Onyx Holdings Inc., account holder POYNER, held at Park Financial, a brokerage firm located in Maitland, Florida, in the Middle District of Florida. On December 7, 2006, the Park Financial Acct. received the remaining 595,238 shares of Edgetech stock, which were transferred from the Onyx Scottrade Acct. mentioned above. On December 19, 2006, the Park Financial Acct. received an additional 1,000,000 shares from the clearing firm handling Edgetech stock. All of the shares of the Edgetech stock held in the Park Financial Acct. were sold by POYNER, who then transferred the $1,320,000 sale proceeds to his Onyx Bank Acct. between December 22, 2006 and February 1, 2007. From July 21, 2007 thru July 21, 2008, an additional $172,251.13 was transferred into Onyx Bank Acct. from Mazel Tuff Acct. #1. As will be discussed below, the funds transferred from Mazel Tuff Acct. #1 were proceeds derived from POYNER'S stock fraud schemes. As of February 29,

21

2008, the balance of the Onyx Bank Acct. was $16,231.51.

42.     The funds contained within the Onyx Bank Acct. are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) and (a)(1)(A).  The funds contained within this account are proceeds from the securities fraud scheme and wire fraud violations; thus, are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C).  Additionally, the account funds were involved in a money laundering scheme, in violation of 18 U.S.C. § 1956, and are subject to forfeiture under 18 U.S.C. § 981(a)(1)(A), because POYNER knowingly moved the proceeds from wire and securities fraud violations thru Onyx Holdings, Inc.'s Scottrade Investment Acct., to Onyx Holdings, Inc.'s Park Financial Acct. and then to Onyx Holdings, Inc.'s Bank of America Account to conceal the source or origin of the funds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Finally, the transactions detailed above were made in violation of 18 U.S.C. § 1957(a) because they involved monetary transactions conducted with more than $10,000 in criminally derived funds and, as such, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## B.  BINGHAM'S INVOLVEMENT IN EDGETECH STOCK

43.     On June 12, 2008, SA Brunner interviewed Gabriel Sandler ("Sandler"), the owner of Sandler Communications, Inc. in Houston, Texas.  Sandler said he was hired by BINGHAM in March 2006 to serve in an "Investor Relations" position for several companies owned or controlled by BINGHAM.   Sandler learned that BINGHAM worked out of his home, located at 1814 Keatley Drive, Houston, Texas 77077, where he lived with his girlfriend Shannon Clegg (the mother of his 9 year-old son), but used storefront addresses, such as 2425 West Loop S. Suite 200, Houston, Texas, to receive mail and send faxes.  Sandler personally worked from BINGHAMS' residence

22

from May 2006 to about December 2006, when BINGHAM moved to his new residence located at 11810 Legend Manor Drive, Houston, Texas. While working from the residence, Sandler observed detailed files stored in BINGHAM's office concerning each company involved in the fraud scheme. Additionally, BINGHAM maintained two desktop computer systems, one used by Sandler and BINGHAM for business activities and another set up with three monitors for tracking real time stock quotes. Sandler eventually moved out of BINGHAM's work space at Keatly Drive to find a location with better working conditions. Eventually, Sandler quit working for BINGHAM due to BINGHAM's conduct. Sandler returned to the BINGHAM'S new office located at Legend Manor Drive on two occasions to inquire about money owed to him in or about January 2007. On both occasions, Sandler noted that BINGHAM had moved his office files and computer systems to his new office and appeared to continue to run his business activities from the office at Legend Manor Drive.

45.     Sandler was hired on a contract basis to handle investor relations for a group of six companies Bingham had invested in or gained control over. Sandler learned from BINGHAM that BINHGAM specialized in pump and dump schemes involving all of the companies BINGHAM controlled. Sandler was personally involved in one of those schemes. Only a few of the companies Sandler worked with actually existed and were run with the purpose of providing products or services, while most of the companies existed on paper only. Sandler identified the following companies and associated stock symbols as companies involved in fraud perpetrated by BINGHAM and his conspirators: Michelex (MLXO), Floodsmart (FDSI), Texxon Inc./Continan Communications (TXXN /CNTN), Maxxon/Revolutions Medical (MXON/RMCP),

23

OneLink (OLKT/OLNK), Industrial Biotechnology(IBTY), Neah Power Systems (NPWS), Produce Safety and Security International (PDSC/ PDSF), Adrenaline Nation Entertainment (ADNL/ADNN), and Reality Racing (RRCG/RRGI). Sandler admitted he would receive blatantly false press releases from BINGHAM'S business partner, Benjamin Hansel ("Hansel"), and post the press releases using his own name as the investor relations contact. Sandler was promised a monthly salary of $6000 and a 50 percent commission obtained from contracts with the companies. Sandler ended his relationship with BINGHAM when he became concerned about the obvious nature of BINGHAM'S business. Sandler knows that BINGHAM is currently using Wall Street P.R., Inc. as his corporate identity, but was previously using Stock Communications Group, Inc. Both companies are controlled by BINGHAM and were established to further his fraudulent activities. Sandler believes BINGHAM has made more than $60 million in profits from his schemes, transferred the proceeds through his Wells Fargo Bank accounts, and transferred much of the money internationally.

46.     In addition to partnering with Hansel, BINGHAM used attorneys Rick Fox and Ronald Kaufman for legal work in relation to his schemes. BINGHAM admitted to Sandler that he used Brian Heckathorn and Roy Campbell to set up web servers for e mail distribution, and fax machines for fax distribution, of stock alert advertisements, a key component for a successful pump and dump scheme. Sandler is aware that POYNER was a partner of BINGHAM on several stock deals.

47.     Based upon the significant transfer of funds from POYNER to BINGHAM, BINGHAM's past citation for sending unsolicited advertisements to telephones and facsimile machines, and the pumping of stocks controlled by POYNER and BINGHAM,

your affiant has probable cause to believe that BINGHAM was the person responsible for providing the e mail distribution and fax distribution of unauthorized stock alert advertisements for POYNER in the securities fraud schemes discussed in this affidavit.

### 1. BINGHAM'S Wall Street Bank Account

48.    Your affiant reviewed bank records for Wells Fargo Bank Account # 3292102336, in the name of Wall Street P.R. Inc ("Wall Street Bank Acct."), under the control of BINGHAM. The account was opened in the Southern District of Texas on May 3, 2006 by BINGHAM, who has sole signature authority over the account. As previously discussed , from September 2006 thru December 2006, POYNER received $1,889,326 from the sale of Edgetech stock in his Park Financial and Scottrade Accounts.  POYNER transferred $1,808,981 from the proceeds of the sale of Edgetech stock to his Onyx Bank Acct.  From June 2006 to October 2006, POYNER transferred $1,550,000 from his Onyx Bank Acct. to BINGHAM'S Wall Street Bank Acct.  Based upon my investigation, I believe that this transfer was compensation by POYNER to BINGHAM for his involvement in the stock schemes mentioned in this affidavit.  Prior to the transfer of Poyner's funds the balance of this account was approximately $109,000. Based upon the statements of Sandler, your affiant believes that all of the funds deposited into this account were from BINGAHM'S stock fraud schemes.  As of March 31, 2008, the account balance was $14,598.79.  The only funds which have been deposited into this account since the deposit of the proceeds from the sale of Edgetech stock in October 2006 are monies from the sale of other stocks.  Based upon Sandler's statements and information gathered from my investigation, BINGHAM is not involved in any legitimate stock sales.

25

## 2. Charles Bingham Bank Account

49.     Further review of bank records from BINGHAM'S Wall Street Bank Acct.

show that from June 2006 thru March 20, 2008, $464,000 was transferred to Bank of

America Account # 312719111, in the name of Charles E. Bingham ("Charles Bingham

Bank Acct."). Your affiant has not received the statements from the Charles Bingham

Acct., but based upon my and SA Brunner's review of the Wall Street Bank Acct., and

the Snuggly Wuggly Acct (discussed below), there is probable cause to believe that all

of the funds deposited into the Charles Bingham Bank Acct. are from stock fraud

schemes involving BINGHAM. The current balance of the account is not known. Since

July 21, 2007, approximately $1.5 million was deposited into this account from

brokerage accounts and companies in such a pattern as to be consistent with witness

testimony concerning his stock fraud schemes. Additionally, since July 21, 2007,

BINGHAM has transferred  $180,000 from BINGHAM'S Wall Street Acct. to this

account.

## 3. Snuggly Wuggly Bank Account

50.     SA Brunner reviewed bank records for Wells Fargo Bank Account #

1914422793, in the name of Snuggly Wuggly, Inc. ("Snuggly Wuggly Bank Acct."), and

found the account was opened on October 11, 2005 in the Southern District of Texas,

by Shannon Clegg as the owner of Snuggly Wuggly, Inc., with sole signature authority

over the account. According to Sandler, this company is a shell company used solely to

collect the proceeds from the sale of stock manipulated by BINGHAM. From March 17,

2006 through March 19, 2008, this account received wire transfers totaling more than

$859,000 from First Clearing, LLC, National Financial, Pension Financial, and Pershing LLC, clearing firms for the transfer of money from broker/dealer firms. Since the account was opened, the only significant deposits into this account were from stock sales transactions. Since July 21, 2007, approximately $214,342 was deposited into this account from the sales of stocks. In my experience, I have found that transfers of this nature are from the sale of stock within brokerage accounts under the control of the individuals receiving transfers into their bank accounts. Based upon my investigation, Shannon Clegg has no reason to be receiving payments from the sale of stock. She is currently the manager of an apartment complex and has not worked in a capacity where she would receive shares of stock as compensation. Her previous and current employment also do not support a finding that she could afford to purchase the stocks that were sold. I reviewed withdrawals from the Snuggly Wuggly Bank Acct. and found two wire transfers totaling $70,000 to the Law Offices of attorney Rick Fox, an alleged co conspirator of BINGHAM previously identified above. Additionally, I noted $261,000 in counter withdrawals in whole dollar amounts ranging from $4000 to $50,000 and one large counter withdrawal of $209,062.58. As of May 31, 2008, the balance of this account is $75,618.95. Based upon my experience and the information detailed above, there is probable cause to believe the funds contained in this account are the proceeds of wire and securities fraud schemes, Shannon Clegg is a nominee and co conspirator of BINGHAM, and BINGHAM is using this account to disguise the true nature of the funds derived through his fraudulent activities. Additionally and as previously mentioned, the only funds being deposited into this account have come from the sales of stocks, which, based upon my investigation, BINGHAM is not involved in any

27

legitimate stock sales.

51.    The funds contained within Bingham's Wall Street Bank Acct., Charles

Bingham's Bank Acct., and the Snuggly Wuggly Acct., are subject to forfeiture pursuant

to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C). The funds contained within these accounts

are proceeds from the securities fraud scheme and wire fraud violations; thus, are

subject to forfeiture under 18 U.S.C. § 981(a)(1)(C). Additionally, these account funds

were involved in a money laundering scheme, in violation of 18 U.S.C. § 1956, and are

subject to forfeiture under 18 U.S.C. § 981(a)(1)(A), because BINGHAM and MCNEELY

knowingly moved the proceeds from wire and securities fraud violations thru several

corporations and entities' bank accounts to conceal the source and true ownership of

the funds, in violation of 18 U.S.C. § 1956(a)(1)(B)(I). Specifically, POYNER moved the

proceeds from the Edgetech and Renegade schemes from his Scottrade and Park

Financial Accounts to his Onyx Holding, Inc.'s Bank of America Account and then

transferred those funds to BINGHAM'S account at Wells Fargo, held in the name of

Wall Street P.R., Inc. in order to conceal or disguise the source and true ownership of

the fraud proceeds.  BINGHAM then moved the fraud proceeds held in his Wells Fargo

Account to his own personal bank account at Bank of America, to further conceal or

disguise the source of the funds.  The Snuggly Wuggly Account was used by POYNER

to deposit the funds from his fraud schemes from clearing houses in order to conceal or

disguise the source and true ownership of the fraud proceeds by using a nominee,

Sharon Clegg, to avoid detection of the funds by authorities. Finally, the transactions

detailed above were made in violation of 18 U.S.C. § 1957(a) because they involved

monetary transactions conducted with more than $10,000 in criminally derived funds

28

and, as such, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## II. RENEGADE ENERGY FRAUD

52.     On April 14, 2008, SA Brunner interviewed Frank Butler ("Butler"), the president of Renegade Energy. In August 2006, he was seeking an investment of $5 million to help develop oil wells on property leased by his company, Petrolex Incorporated ("Petrolex"). Through his search for funding, he was introduced to Dennis Mancino ("Mancino"), a businessman in Ft. Lauderdale, Florida. He had lengthy conversations with Mancino, explaining that he had no background in the area of raising capital or taking companies public. Mancino introduced him to an attorney, Michelle Kain ("Kain"), a lawyer who could provide him with the advice necessary to assist him in the development of his company. Kain later asked for a $20,000 retainer as a fee for her services. When Butler told Kain he did not have the money available to pay the retainer, Butler was told the fee was covered by another person, without disclosing who had provided the fee. Butler later learned that Kain's law firm, Kain and Valinsky PA, also represented POYNER.

53.     During the same time period, Mancino introduced Butler to POYNER. POYNER was introduced as a businessman who represented a group of investors who could provide $5 million in financing to help develop his oil wells. As a result of the introduction, Butler traveled to Ft. Lauderdale and met POYNER, Mancino, and other individuals, whose names he could not remember who were identified as businessmen who could obtain funding for Butler. The meeting occurred at a restaurant and Butler explained his oil leases and the need for the $5 million to bring the oil wells back into production. POYNER agreed to provide the funding and explained that Petrolex would

29

be merged with an existing corporate shell trading in the Over The Counter market (a trading vehicle for securities which are not traded on an exchange, usually due to an inability to meet listing requirements). POYNER said he would provide $1 million in funding to Butler within 90 days of the formation of the new company, an additional $1 million in the next 90 days, and the remaining $3 million within 180 days. In exchange for POYNER's assistance in forming the company and providing the funding, Butler agreed to give POYNER ten percent of the newly formed company.

54.     In preparation for forming the new company, Butler was instructed to create a company called Sunrise Petroleum Resources, which would be used to merge with a corporate shell being obtained by POYNER. After forming the company and attempting to take it public, Mancino explained that a problem occurred and they were seeking another shell company that was "clean." Ultimately, Renegade Energy, formerly America Asia Energy Corporation (the stock that is the subject of criminal charges against Clayton and Furusho), was created and used as the shell to merge with Petrolex.

55.     During this time, Butler was told that he would be represented by a new attorney, Clayton, a partner with attorney Furusho. All filings were prepared by the law firm and presented to him for his signature. Additionally, POYNER introduced Butler to Scott Cavanaugh, a person who would interview Butler and produce press releases for the company. POYNER told Butler he wanted Butler to provide ten positive press releases for his company.

56.     Butler was provided with documents to sign and understood that POYNER would be receiving 10 percent of 109 million shares authorized for the new company.

All of the shares were restricted and it was Butler's understanding that the shares could not be sold for 2 years. Trading began in February 2007, and Butler noticed that the first few press releases caused high volume trading and the price of his stock to increase to $3 a share. He then observed that someone was selling a significant amount of shares on the market, causing the share price to tumble after each press release. He also learned that 17 million shares owned by POYNER and his associates were converted to unrestricted shares. When he questioned Clayton about the removing of the restriction, she explained that he was mistaken on his agreement with the investors, and that POYNER's shares were not intended to be restricted.

57.    SA Brunner reviewed corporate documents for Renegade Energy with Butler and observed the following shareholders of unrestricted stock:

| | |
|---|---|
| Mazel Tuff Holdings LLC (POYNER) | 5,000,000 |
| Mendocino Group Inc. (SOTO) | 4,250,000 |
| D.P. Minahan Inc. (MINHAN) | 4,000,000 |
| Daniel MINAHAN | 1,700,000 |
| TJM Investments | 1,000,000 |
| Kenneth J. Dunn PA | 500,000 |
| Oxygen Capital Inc. | 250,000 |
| Corporate Services Northwest Inc (Clayton) | 244,000 |
| Dr. William Conte | 56,000 |

58.    Butler was told by POYNER that Mazel Tuff Holdings and the Mendocino Group belonged to POYNER. He knew MINAHAN was the owner of D.P. Minahan and a business partner of POYNER. He believed TJM Services was related to Mancino.

31

Butler did not know Kenneth Dunn PA, Oxygen Capital. or Dr. William Conte, and did not know why they received unrestricted shares in his company. Butler knew that Clayton was to receive compensation for her work through her association with Corporate Services Northwest.

59.     Butler observed what he now understands to be the "pump and dump" of his stock (the releasing of positive, false information to the public about a stock's potential performance with the intention of selling the shares of the stock to profit from the release of the information), a violation of SEC regulations. Once he observed the activity, he set up a meeting with POYNER to discuss the issue as well as the fact POYNER had not provided any of the financing he had promised. In April 2007, he met POYNER at his residence. When he entered the condominium he was met by MINAHAN, the person identified by POYNER as his business partner. Butler asked POYNER why he was dumping shares after each press release. POYNER said he had to sell shares he owned to recoup the cost of buying two shell companies, each costing $500,000. POYNER blamed Clayton for the problem, saying she was responsible for the initial delay because the first company she purchased was not usable for their purposes. As a result of Clayton's mistake, POYNER said he was withholding shares due to Corporate Services Northwest that were to her benefit. Butler asked POYNER when he would provide the financing he promised, with POYNER saying that Butler was supposed to provide ten positive press releases when only three had been provided. Butler told POYNER there was nothing further to report because the funding had not been provided to begin the drilling of the oil wells. POYNER said he was still attempting to find the funding he promised. Butler left the meeting without resolving any issues

32

and believed POYNER would not provide any funding.  He later confirmed his belief in a telephone call with POYNER.  During the call, POYNER said an investor who had agreed to provide half of the funding changed his mind, and therefore, POYNER would not provide his share of the investment funds.  This dispute ended his relationship with POYNER and caused the stock of the company to fall.  In March 2007, shares of Renegade Energy were trading as high as $2.20 a share.  On June 12, 2008, shares in Renegade Energy closed at 0.021 per share.

60.    Butler said a representative of the SEC contacted him about press releases issued by Stock Alert 2007 on or about February 16, 2007 and April 16, 2007.  Both releases predicted huge increases in the price of the stock.  Butler said he was not responsible for the releases and had never heard of the company releasing the information.

61.    I reviewed relevant corporate records of Renegade Energy Corporation concerning filings related to its corporate activities.  Renegade Energy Corporation, formerly known as America Asia Energy Corporation, listed its registered office as 12819 SE 38 St. #21, Bellevue, Washington, 98006, corporate addresses used by Clayton and Furusho.

62.    Based upon my investigation, there is probable cause to believe that POYNER, MINAHAN, and his investors mislead Butler into believing they were interested in a long term investment in Renegade Energy.  Further, there is also probable cause to believe POYNER caused the rise of Renegade Energy stock through press releases issued by Stock Alert 2007 and that POYNER, MINAHAN, SOTO, and PUCCIO illegally profited from the sale of stock, while using the companies, investment

33

accounts, and bank accounts under their control to promote their illegal activities.

63.    On July 22, 2008, search warrants were executed on POYNER,
MINAHAN, SOTO and BINGHAM'S residences as a result of their involvement with the
activities described in this affidavit. Additionally, seizure warrants were executed on
eleven financial accounts after a finding that the contents of the accounts contained
proceeds traceable to the wire and securities fraud violations and were involved in
money laundering offenses, including two of the accounts mentioned in this affidavit:
Mazel Tuff Bank Account #1 and Mazel Tuff Bank Account #2.

### 1. Mazel Tuff Bank Account #1

64.    Your affiant reviewed bank records for Bank of America Account #
008983279882, opened on September 1, 2006 in Boca Raton, Florida, in the name of
Mazel Tuff Holdings, LLC ("Mazel Tuff Bank Acct #1"), with the company address of
1768 Bay Drive, Pompano Beach, Florida, 33062.  The sole signature authority on the
account was Cort POYNER, listed as the member manager of the company.  Between
February 15, 2007 and May 14, 2007, Park Financial Brokerage Account # 651102054,
opened by POYNER on January 30, 2007, with POYNER having sole signature
authority, received approximately $1,049,742.01 from the sale of Renegade Energy
stock.  POYNER'S Park Financial Account is located in Maitland, FL, in the Middle
District of Florida.  Between March 14, 2007 and July 10, 2007, $1,110,000 was
transferred from POYNER'S Park Financial Account to Mazel Tuff Bank Acct. #1 (this
included a transfer of approximately $60,000 from the sale of other stock believed to be
part of POYNER'S fraudulent activities).  After July 21, 2007, $739,900, which is
believed to be all from the sale of stock, was transferred into the Mazel Tuff Bank Acct.

34

#1. Specifically, on July 26, 2007, $110,000 was transferred from POYNER'S Park
Financial Acct. to Mazel Tuff Bank Acct. #1. Based upon your affiant's investigation,
there is no evidence that legitimate funds were placed into this account after July 21,
2007. As of December 31, 2007, the account balance was $3,000.

## 2. Mazel Tuff Bank Account #2

65.    Your affiant reviewed bank records for Bank of America Account #
898004313206 ("Mazel Tuff Bank Acct #2"), opened on May 14, 2007 in the Southern
District of Florida, in the name of Mazel Tuff LLC, with the company address of 1768
Bay Drive, Pompano, Beach, Florida, 33062. Signature authority on the account was
held by Cort POYNER and Marcie McNeely. This account received $1,124,000 from a
Hartford Life Insurance Annuity ("Hartford Annuity"), which was established by
POYNER as a pass through account to move his criminally derived proceeds. Based
upon the investigation, SA Brunner learned that POYNER purchased the Hartford
Annuity with proceeds from the sale of Renegade Energy and Edgetech stock, as well
as $500,000 from Mazel Tuff Bank Acct. #1 (which contained proceeds traceable to the
sale of Renegade Energy stock). At one point, the Hartford Annuity had a value of
$5,662,927.13. No legitimate income was used to purchase the Hartford Annuity.
Between May 18, 2007 and August 13, 2007, Mazel Tuff Bank Acct. #2 received
transfers of $1,124,000 from the Hartford Annuity. Of this amount, $31,000 was
transferred after July 21, 2007. As of February 29, 2008, this account had a balance of
$174,627.27.

### 3. Poyner Trust Accounts #1 and #2

66.     Your affiant reviewed bank records for First Republic Bank Accounts # 979-1000-2603 and # 979-1000-2629, in the name of Mazel Tuff Trust #2 C/O Alan Lederfeind ("Poyner Trust Accts. #1 and #2"), in the care of trustee Alan Lederfeind, established in the Southern District of New York on June 11, 2007, and under the control of POYNER. Poyner Trust Acct. #1 appears to have been opened  for the sole purpose of receiving profits from the stock fraud schemes; no other funds of significance appeared to have been deposited into this account since it was opened. Poyner Trust Acct. #1 was originally funded with $500,000 from the Hartford Annuity, discussed above.  I observed the sales of Renegade Energy and Edgetech stock by POYNER from August 18, 2006 to May 14, 2007, the proceeds of which were transferred to Mazel Tuff Bank Acct. #1 and the Onyx Bank Acct., both under the control of POYNER.  As previously discussed, no legitimate funds were used to purchase the Hartford Annuity.  The Hartford Annuity was later dissolved on July 2, 2007, and $2,217,712.37 was transferred to Poyner Trust Acct. #1 on March 5, 2008. On March 15, 2008, Poyner Trust Acct #1 transferred $2,025,000 of those proceeds to Poyner Trust Acct. #2.  As of March 31, 2008 the balance of Poyner Trust Acct. #1 was $3,690.54, and the balance of Poyner Trust Acct. #2 was $2,076,156.17.

67.     The funds contained within the two Mazel Tuft Accounts and Poyner's Trust Accounts are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C).  The funds contained within these accounts are proceeds from the securities fraud scheme and wire fraud violations; thus, are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C).  Additionally, these account funds were involved in a money laundering

scheme, in violation of 18 U.S.C. § 1956, and are subject to forfeiture under 18 U.S.C. § 981(a)(1)(A), because POYNER knowingly moved the proceeds from his wire and securities fraud violations thru several corporations and entities' bank and investment accounts to conceal the source and true ownership of the funds, in violation of 18 U.S.C. § 1956(a)(1)(B)(I). Specifically, POYNER transferred the profits from his Renegade stock fraud to his Park Financial Account, then moved those funds to his Mazel Tuff Acct. #1, which was held in the name of Mazel Tuff Holdings, LLC. Moreover, POYNER used the proceeds from the Edgetech and Renegade schemes to purchase the Hartford Annuity, and then transferred the gains from the Hartford Annuity to his Mazel Tuff Acct. #2, which was held in the name of Mazel Tuff, LLC. In addition, POYNER moved the Hartford Annuity proceeds to the Poyner Trust Acct. #1 (held in the name of Mazel Tuff Trust #2) and then further moved funds from that account to the Poyner Trust Acct. #2 (also held in the name of Mazel Tuff Trust #2). Finally, the transactions detailed above were made in violation of 18 U.S.C. § 1957(a) because they involved monetary transactions conducted with more than $10,000 in criminally derived funds and, as such, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

### 4. D.P. Minahan Bank Account

68.     Your affiant reviewed Park Financial Brokerage Account # 65112104, in the name of D.P. Minahan, Inc., opened in the Southern District of Florida, on February 5, 2007 by MINAHAN as the sole signature authority on the account. From February 1, 2007 to March 31, 2007, this account received 3.2 million shares of Renegade Energy unrestricted stock, which was then sold by MINAHAN for a profit of $817,092.88, the

37

proceeds were held in the account prior to transfers to other bank accounts. Based upon my investigation, it appears Wachovia Bank Account # 2000021391770, in the name of D.P. Minahan Inc ("D.P. Minahan Bank Acct."), was opened by MINAHAN in 2004, and appeared to have funds outside of the stock fraud scheme prior to January 26, 2007. From March 15, 2007 thru May 16, 2007, MINAHAN transferred $580,000 of the proceeds from the sale of Renegade stock to his D.P. Minahan Bank Acct. As of April 30, 2008, the balance of this account was $137,502.33.

69.     The funds contained within this account are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C). The funds contained within this account are proceeds from the securities fraud scheme and wire fraud violations; thus, are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C). Additionally, the account funds were involved in a money laundering scheme, in violation of 18 U.S.C. § 1956, and are subject to forfeiture under 18 U.S.C. § 981(a)(1)(A), because MINAHAN knowingly moved the proceeds from his wire and securities fraud violations to his Park Financial Acct. (held by D.P. Minahan, Inc.), and then further moved those proceeds to his account at Wachovia Bank, held in the name of D.P. Minahan, Inc. to conceal the source of the funds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Finally, the transactions detailed above were made in violation of 18 U.S.C. § 1957(a) because they involved monetary transactions conducted with more than $10,000 in criminally derived fundsand, as such, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## McNeely Bank Account

70.     Your affiant reviewed records from Bank of America concerning Mazel Tuff Bank Acct. #1, Martha McNeely or Bonnie White Bank of America Account #

001443941299 ("McNeely and White Bank Acct."), opened March 12, 1997, with the signature authority of Martha McNeely and Bonnie White. Legitimate funds appeared to have been initially deposited into this account from real estate transactions both women were involved in. However, the last known deposits relating to legitimate funds were in October 2006, in amounts that totaled less than $10,000. I also reviewed records from Bank of America Account # 003738395055, in the name of Martha R McNeely or Bonnie White ("McNeely Bank Acct"), which appear to have been opened by the same individuals at the same time in the Southern District of Florida. From February 28, 2005 to April 10, 2008, the McNeely and White Bank Acct. received $331,059.37 from a combination of funds from Mazel Tuff Bank Acct. #2, Poyner Trust Acct. #1, Onyx Bank Acct., and the Hartford Annuity, accounts previously described in this affidavit as containing funds from POYNER'S stock fraud schemes. From July 21, 2007 until the present time, $93,000 from the Mazel Tuff Trust Acct. #2 was transferred into the McNeely and White Acct. From February 28, 2008 to April 14, 2008, MCNEELY transferred $80,696.10 from the McNeely and White Bank Acct. to the McNeely Bank Acct. As of March 31, 2008, the balance of the McNeely Bank Acct. was $434,000. There is probable cause to believe that all of the proceeds located in this account are from POYNER'S stock fraud schemes, transiting through his accounts, the McNeely and White Bank Acct. and finally deposited into the McNeely Bank Acct.

71.     The funds contained within this account are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C). The funds contained within this account are proceeds from the securities fraud scheme and wire fraud violations; thus, are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C). Additionally, the account funds were

39

involved in a money laundering scheme, in violation of 18 U.S.C. § 1956, and are subject to forfeiture under 18 U.S.C. § 981(a)(1)(A), because POYNER an MCNEELY knowingly moved the proceeds from POYNER'S wire and securities fraud violations thru the McNeely and White Bank Account and then to the McNeely Account to conceal the source and true ownership of the funds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Finally, the transactions detailed above were made in violation of 18 U.S.C. § 1957(a) because they involved monetary transactions conducted with more than $10,000 in criminally derived funds and, as such, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

### Tracing of Proceeds Used to Purchase the Vista Del Mar Residence

72.     I reviewed a warranty deed related to the purchase of 1119 Vista Del Mar Drive North, Delray Beach, Florida, 33483 ("Vista Del Mar property"), by Alan Lederfeind, as trustee for the Mazel Tuff Trust #2, for $2.75 million, recorded on June 25, 2007.  Based upon my investigation, I know that POYNER resides at this address.

73.     Your affiant reviewed bank records for Mazel Tuff Bank Acct #1.  As stated above, between February 15, 2007 and May 14, 2007, Park Financial Brokerage Account #651102054 received approximately $1,049,742.01 from the sale of Renegade Energy stock.  Between March 14, 2007 and July 10, 2007, $1,110,000 was transferred from POYNER'S Park Financial Account to Mazel Tuff Bank Acct. #1 (this included a transfer of approximately $60,000 from the sale of other stock believed to be part of POYNER'S fraudulent activities).

74.     Your affiant reviewed bank records for Mazel Tuff Bank Acct #2.  This account received $1,124,000 between May 18, 2007 and August 13, 2007 from the

40

Hartford Life Annuity. As stated previously in this affidavit, no legitimate income was used to purchase the Hartford Annuity. POYNER purchased the Hartford Annuity with proceeds from the sale of Renegade Energy and Edgetech stock, as well as $500,000 from Mazel Tuff Bank Acct. #1 (which contained proceeds traceable to the sale of Renegade Energy stock, as discussed above).

75.      On June 20, 2007, I noted a transfer of $1,066,636.82 from the Mazel Tuff Bank Acct. #2 to the law firm of Siegal, Lipman, Dunay, Sheppard, and Miskel LLP, the law firm noted as the preparing entity of the warranty deed for 1119 Vista Del Mar Drive North, Delray Beach, Florida. Additionally, I observed four payments of $15,265.64 sent from Mazel Tuff Bank Acct. #2 used to pay the mortgage on this property. Based upon this information, there is probable cause to believe that criminally derived funds were used to purchase the Vista Del Mar property, in violation of 18 U.S.C. §§ 1956 and 1957.

76.      The Vista Del Mar property is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C). The Vista Del Mar property was purchased with proceeds from the securities fraud scheme and wire fraud violations; thus, is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C). Additionally, the property was involved in a money laundering scheme, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and is subject to forfeiture under 18 U.S.C. § 981(a)(1)(A), because POYNER knowingly moved the proceeds from his wire and securities fraud violations thru his Park Financial Acct., to Mazel Tuff Bank Acct. #1 (held by a corporation created to conceal the true owner of the funds-POYNER), then purchased the Hartford Annuity with funds from Mazel Tuff Bank Acct. #1, as well as proceeds from the sale of Edgetech and other Renegade

41

Energy stock, which annuity was then used to funnel criminally derived funds to Mazel

Tuff Bank Acct. #2 (also held by a corporation created to conceal the true owner

funds-POYNER), and ultimately used to purchase the Vista Del Mar. Finally, the

transactions detailed above were made in violation of 18 U.S.C. § 1957(a) because

they involved monetary transactions conducted with more than $10,000 in criminally

derived funds and, as such, are subject to forfeiture pursuant to 18 U.S.C. §

981(a)(1)(A).

**Assets Seized at MINAHAN'S Residence Pursuant to a**
**Search Warrant Executed on July 22, 2008**

77.    Pursuant to a search warrant executed on July 22, 2008, FBI agents

located $11,800 in U.S. Currency in MINAHAN'S residence.  Upon the search of a safe

located in MINAHAN'S closet, FBI agents located $8,000 in U.S. Currency, comprised

of one hundred dollar bills.  An additional $3,800 was found in an unlocked jewelry box

located in what appeared to be MINAHAN's wife's closet, all in one hundred dollar

denominations.

78.    Also found in MINAHAN's closet were three men's watches.  A Rolex and

Jacob & Co. watch were found, along with the $8,000 in U.S. Currency mentioned

above, in a safe in MINAHAN's closet.  Breitling watch #1 was found on a shelf in his

closet.  Moreover, a second man's Breitling watch (Breitling watch #2) was located in

MINAHAN's wife's closet in the same jewelry box where the $3,800 in U.S. Currency

was found.  MINAHAN'S wife's closet is located in the room where both MINAHAN and

his wife sleep, so both MINAHAN and his wife have access to the closet.  Purchase

receipts for the Rolex and two Breitling watches were located in the safe in MINAHAN'S

42

closet.  All receipts were in MINAHAN'S name.  The purchase receipt for the Rolex

shows that the Rolex was purchased on January 18, 2007 for $19,027.  MINAHAN paid

$9,900 of that in cash, with the remainder being placed on his Visa credit card.

MINAHAN purchased Breitling watch #1 on December 21, 2006 for $31,800.  The

watch was paid for in full via check (check #1495) from his D.P. Minahan Bank Acct.,

discussed above.  Breitling watch #2 was purchased on February 13, 2007 for $7,473.

FBI agents could not locate the receipt for the Jacob & Co. watch.  However, an

appraisal for the watch was located in MINAHAN'S closet safe.  The appraisal was

performed on December 13, 2006, and the watch was appraised for $46,500.

79.    A purchase receipt and appraisal for the diamond engagement ring were

also located in the safe in MINAHAN's closet.  The diamond ring was purchased on

December 8, 2007 for $90,100.  MINAHAN paid $17,100 via check from his D.P.

Minahan Bank Acct., with the remainder being placed on his Visa credit card.

80.    Agents also located the Bill of Sale for the 2006 Lamborghini  in

MINAHAN's garage.  MINAHAN purchased the 2006 Lamborghini  on December 8,

2006.  MINAHAN paid $67,000 down in cash for the vehicle and financed the

remanding balance.

### Tracing of the Proceeds Used to Purchase the Assets Seized
### at MINAHAN'S Residence on July 22, 2008

81.    As stated in above, the Silverman and Minahan Group, a company owned

jointly by POYNER and MINAHAN, received 2,650,000 shares of Edgetech stock.  This

stock was deposited into POYNER'S Onyx Scottrade and Park Financial Accounts.

From September 18, 2006 until October 26, 2006, the Onyx Scottrade Acct. generated

43

more than $509,955.87 from the sale of 361,394 shares of stock in this account.
Between September 25, 2006 and October 20, 2006, POYNER transferred
$488,981.54 to his Onxy Bank Acct.  POYNER then transferred $200,000 from the sale
of the Edgetech stock from his Onyx Bank Acct. to the D.P. Minahan Acct. on October
24, 2006, POYNER'S first split of funds with MINAHAN related to the Edgetech fraud.
POYNER sent a second transfer of $200,000 from his Onyx Bank Acct. to the D.P.
Minahan Bank Acct. on December 18, 2006, POYNER'S second split of funds with
MINAHAN.

     82.     The purchases of the four watches, one diamond ring and 2006
Lamborghini were all made between December 8, 2006 and February 13, 2007, during
the time frame which the proceeds from the sale of the Edgetech fraud were deposited
into the D.P. Minahan Bank Acct.  Additionally, the funds used to purchase the diamond
ring and Breitling watch #1 were both traced back to the D.P. Minahan Acct.  Although
MINAHAN did receive an income in the D.P. Minahan Acct. from Mainline Mortgage up
until January 26, 2007, the funds being received from Mainline Mortgage were
insufficient to justify the purchases made by MINAHAN, as discussed above.
MINAHAN would received approximately $3,000-$10,000 from Mainline Mortgage, but
shortly after the funds were deposited into the D.P. Minahan Acct., most of the funds
were withdrawn to pay employees.  As such, there is probable cause to believe that the
funds used to purchase the four watches, diamond ring and 2006 Lamborghini , were
from the proceeds of the Edgetech fraud.  Moreover, there is probable cause to believe
that the cash located in MINAHAN'S residence is the proceeds from the securities fraud
schemes mentioned in this affidavit.  As stated previously in this affidavit, it is believed

44

that all of MINAHAN'S income earned from January 26, 2007 until the date of this
affidavit is directly related to his fraudulent activities.

83.     The diamond ring, 2006 Lamborghini , four watches and $11,800 in U.S.
Currency are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).  The diamond
ring, 2006 Lamborghini , and four watches were purchased with proceeds from the
securities fraud scheme and wire fraud violations, and the cash is proceeds of the
securities fraud violations; thus, they are subject to forfeiture under 18 U.S.C. §
981(a)(1)(C).  Additionally, the diamond ring, 2006 Lamborghini , and four watches
were involved in a money laundering scheme, in violation of 18 U.S.C. §
1956(a)(1)(B)(i), and are subject to forfeiture under 18 U.S.C. § 981(a)(1)(A), because
POYNER & MINAHAN knowingly moved the proceeds from their securities fraud
violations thru POYNER'S Onyx Scottrade and Park Financial Accts., then to
POYNER'S Onyx Bank Acct., then to MINAHAN'S D.P. Minahan Bank Acct., which
money was then drawn from to purchase the diamond ring, 2006 Lamborghini , and
four watches. Finally, the financial transactions made for the diamond ring, 2006
Lambourgini, Rolex watch, Jacob & Co. watch and Breitling watch #1 were made in
violation of 18 U.S.C. § 1957(a) because they involved monetary transactions
conducted with more than $10,000 in criminally derived funds and, as such, are subject
to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

### 2008 Bentley Seized at POYNER'S Residence Pursuant to a
### Search Warrant Executed on July 22, 2008

84.     On July 22, 2008, FBI agents executed a search warrant at POYNER'S
residence located at 1119 Vista Del Mar Drive North, Delray Beach, Florida.  As a result

of the search warrant, FBI agents seized a 2008 Bentley located in POYNER'S garage, based upon probable cause that the vehicle was purchased with the proceeds of securities fraud violations that POYNER is alleged to be involved in. Based upon statements made by POYNER at the time of the search, it was determined that the vehicle was purchased approximately five days prior to the search from Braman Motorcars. However, POYNER did not have the purchase documents for the vehicle. POYNER indicated that he was the sole owner of the 2008 Bentley and that he had traded in a 2007 black Bentley and a 2007 Porsche for this Bentley, with no money utilized for a down payment.

### Tracing of the Proceeds Used to Purchase the 2008 Bentley Seized at POYNER'S Residence on July 22, 2008

85.    POYNER advised that in 2006, he purchased a Bentley from Braman Motorcars and paid $100,000 for the down payment, which was wired from one of his corporate accounts. A Bill of Sale seized at the time of the search confirms that POYNER purchased a Bentley from Braman Motorcars on June 2, 2006 for $279,184.31. Records show that POYNER transferred $100,000 from his Onyx Bank Acct. on June 2, 2006 to Braman Motorcar's bank, SunTrust and that POYNER put $100,000 down as a down payment on the vehicle. As was discussed previously in this affidavit, between December 22, 2006 and February 1, 2007, all of the shares of the Edgetech stock held in POYNER's Park Financial Acct. were sold by POYNER, who then transferred the $1,320,000 sale proceeds to his Onyx Bank Acct. Based upon the lack of evidence suggesting that POYNER had income other than from his stock fraud schemes, there is probable cause to believe that the 2006 Bentley was purchased with

46

funds obtained from the Edgetech fraud.

86.    Thereafter, records show that POYNER traded in his 2006 Bentley, which
was partly purchased with criminally derived funds, for a 2007 Bentley on May 12,
2007, during the same time frame as POYNER was profiting from the Renegade
Energy fraud.  The trade in was valued at $182,234.00.  POYNER put a down payment
of $150,000, via check, down for the 2007 Bentley.  The total purchase price for the
2007 Bentley was $414,372.67.

87.    Based upon POYNER's statements, he then traded in the 2007 Bentley,
along with a 2007 Porsche he owned, to purchase the 2008 Bentley.  POYNER
purchased the 2006 Bentley with proceeds from the sale of Edgetech stock, then used
the 2006 Bentley to partially pay for the 2007 Bentley.  As such, the 2007 Bentley was
partially paid for with the proceeds from the Edgetech fraud.  The 2007 Bentley was
then used as partial payment for the 2008 Bentley, thereby using Edgetech fraud
proceeds to purchase the 2008 Bentley.  Finally, as previously mentioned, there is
probable cause to believe that all of POYNER'S income earned from September 16,
2002 until the date of this affidavit is directly related to his fraudulent activities.
Therefore, there is probable cause to believe that the 2008 Bentley was purchased with
criminally derived proceeds.

88.    The 2008 Bentley is subject to forfeiture pursuant to 18 U.S.C. §§
981(a)(1)(A) and (a)(1)(C).  The funds used to purchase the 2008 Bentley were derived
from the securities fraud scheme and wire fraud violations; thus, the vehicle subject to
forfeiture under 18 U.S.C. § 981(a)(1)(C).  Additionally, the 2008 Bentley was involved
in a money laundering scheme, in violation of 18 U.S.C. § 1956, and is subject to

47

forfeiture under 18 U.S.C. § 981(a)(1)(A), because POYNER knowingly moved the proceeds from his wire and securities fraud violations thru his Park Financial Acct., then moved those funds to his Onyx Bank Acct., which funds he then used to purchase the 2006 Bentley in to conceal the source and true ownership of the funds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  POYNER then traded in the 2006 Bentley for the 2007 Bentley, then traded in the 2007 Bentley for the 2008 Bentley in to further conceal the source and true ownership of the funds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Finally, the transactions detailed above were made in violation of 18 U.S.C. § 1957(a) because they involved monetary transactions conducted with more than $10,000 in criminally derived funds and, as such, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

_____
James Raby, Special Agent
Federal Bureau of Investigation

State of Florida

County of Orange

Before me, the undersigned authority personally appeared, Special Agent James
Raby, who having produced his Federal Bureau of Investigation credentials as
identification and having being duly sworn, deposes and says that the foregoing
Affidavit is true to the best of his knowledge, information and belief, Witness my hand
and official seal in the State of Florida, County of Orange this ___ day of July, 2008.

_____
Notary Public

Commission Expires:

Tyline R. Medina
Commission # DD590194
Expires December 29, 2010
Bonded Troy Fain - Insurance, Inc. 800-385-7019